<pre>
 1                 UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ALASKA

 3   PAUL BLAKESLEE,              )    Case 3:09-cv-00214-SLG
                                  )
 4              Plaintiff,        )    Anchorage, Alaska
                                  )    Monday, March 4, 2013
 5      vs.                       )    8:33 o'clock a.m.
                                  )
 6   SHAW INFRASTRUCTURES, INC.,  )    TRIAL BY JURY – DAY 1
                                  )
 7              Defendant.        )
     ─────────────────────────────)

 8

 9           PARTIAL TRANSCRIPT OF PROCEEDINGS

10            PLAINTIFF'S OPENING STATEMENT

11       BEFORE THE HONORABLE SHARON L. GLEASON
                UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13
     For the Plaintiff:      HOWARD S. TRICKEY
14                           MATTHEW SINGER
                             Attorneys at Law
15                           Jermain Dunnagan & Owens
                             3000 A Street, Suite 300
16                           Anchorage, Alaska  99503
                             907-563-8844
17

18   For the Defendant:      DOUGLAS S. PARKER
                             SEAN HALLORAN
19                           Attorneys at Law
                             Littler Mendelson, PC
20                           310 K Street, Suite 400
                             Anchorage, Alaska  99501
21                           907-561-1214

22
     Court Recorder:         SUZANNETTE DAVID
23                           U.S. District Court
                             222 West 7th Avenue, Box 4
24                           Anchorage, Alaska  99513-7564
                             907-677-6102
25
</pre>

1  APPEARANCES (CONTINUED):

2  Transcription Service:    GAYLENE'S WORD SERVICES
                             M. Gaylene Larrecou
3                           7330 Madelynne Drive
                             Anchorage, Alaska  99504-4659
4                           907-338-3936

5  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       **ANCHORAGE, ALASKA – MONDAY, MARCH 4, 2013**

2    (Courtroom 3)

3         (On record at 8:33:43 a.m.)

4         (This portion not requested)

5    [2:11:11 p.m.]

6                    **PLAINTIFF'S OPENING STATEMENT**

7         MR. SINGER:  We represent Paul Blakeslee.  This case

8    is about whistleblower retaliation and age discrimination.

9    Under Shaw's code of conduct, employees like Paul Blakeslee

10   were encouraged to report wrongdoing, especially wrongdoing

11   involving government contracts and taxpayer dollars.  Shaw

12   made a promise, and that promise was if employees report

13   issues, Shaw would take those reports seriously and Shaw would

14   not tolerate retaliation.

15        Paul wrote a letter to the CEO of the company, and

16   he reported that his boss here in Alaska, Project Manager

17   Richard Lantz, owned a private leasing company called American

18   Leasing, and Mr. Lantz was using this American Leasing to do

19   business with Shaw and the military through Shaw's contract.

20        Mr. Blakeslee also raised a concern about age

21   discrimination, a serious concern.  He told Shaw's CEO how

22   Lantz and the site manager at Ft. Richardson, Tom Stockmaul,

23   had recently called Paul into their office, demanded to know

24   when he was going to retire because of his age, and that when

25   he said he had no interest in retiring, they told him, well,

1  we're thinking about eliminating your position.

2  　　　　The evidence will show that the things Mr. Blakeslee

3  wrote in his letter were true.  In fact, as a result of his

4  report, Shaw stopped an improper arrangement between American

5  Leasing and Mr. Lantz, and Shaw terminated Mr. Lantz because

6  of his misrepresentation and his violation of these rules.

7  But, unfortunately for Mr. Blakeslee, his whistleblowing cost

8  him his job.

9  　　　　Shaw received his letter on September 23rd, 2008.

10  One day later, September 24th, 2008, Richard Lantz, the

11  subject of the letter, Mr. Lantz initiated a one-man reduction

12  in force, asking Human Resources for permission to process a

13  termination to get rid of Mr. Blakeslee.

14  　　　　You'll heard that this was supposedly a

15  reorganization, but Mr. Blakeslee was the only person who lost

16  his job.  He was the only person targeted.  The evidence will

17  show that the reduction in force and the reorganization is a

18  false explanation and that this was really a retaliatory

19  discharge.

20  　　　　The evidence will show that Mr. Blakeslee is an

21  honorable man and he did a courageous thing.  He took a risk

22  and reported illegal wrongful conduct, and he promptly lost

23  his job as a result.

24  　　　　Now, let me tell you a little bit about Shaw.  Shaw

25  is a company based down in Baton Rouge, Louisiana.  It's a

large company, Fortune 500 company, with 25,000 employees all
around the world, and one of their main business lines is
government contracting.  Here in Alaska, Shaw has a contract
with the United States military to provide what's called
support services at Ft. Richardson here in Anchorage and up at
Ft. Wainwright in Fairbanks.  Shaw is basically responsible
for maintaining all of the facilities on those two bases.

It's a big contract.  According to testimony, you'll
hear from 2003 to 2008, that five-year period, the contract
was worth $160,000,000.  The current five-year contract is a
$180,000,000 contract.  Shaw has 180 employees in Alaska.

You're going to hear about how part of the contract
is done on a cost-plus basis.  And what you'll learn is what
that means is if Shaw needed a piece of equipment to mow the
grass or to fix a sewer line, then it could go buy or lease
that equipment under rules that apply, but then that cost gets
passed on to the government and ultimately to taxpayers.
That's what cost-plus means.

You're also going to hear testimony about rules and
regulations that apply to government contracts.  You'll hear
witnesses who mention and talk about the Federal Acquisition
Regulations.  You might hear them called the "FARs."  You're
going to hear that there are rules on things like competitive
bidding and there are rules against conflicts of interest.

You'll hear that Mr. Lantz had a duty to disclose

his conflict of interest.  You'll hear that a person in a position of authority working on a government contract is not allowed to use that position to benefit his own personal business or financial interest.  That's a conflict of interest.  And you're going to hear that Alaska Project Manager Richard Lantz, he violated the rules.  He used his high-level position at Shaw to line his own pockets.

What happened is this.  Mr. Lantz and another Shaw employee, a fellow named Steve Helstrom, and a gentleman named Al Whitney set up this company, American Leasing.  The only purpose of American Leasing, its only business, was to lease to Shaw for use on the government contracts, so all of the money that American Leasing received was government money, and it came through its deals with Shaw.

You're going to see Richard Lantz's emails in the course of this trial, and you'll see that he wrote these emails on his own email system, using his Shaw email -- I'm sorry, on his Shaw email address in Shaw's email system.  And what he was doing was trying to keep his American Leasing ownership a secret from the company.

And I'm going to show you some exhibits during my opening today.  These are exhibits that the judge has already ruled are admitted as evidence in the case.  And I'll show them to you -- if we can get the screen -- I'll show them to you.  Later in the case you'll have the opportunity to look at

1 these for yourself.  I'll try to read them, and you can read

2 with me.  If I go too fast, though, you will have a chance to

3 look at all of these documents for yourself later in the case.

4          THE COURT:  You might want to wait a moment for that

5 noise.

6     (Equipment noise)

7          THE COURT:  Thank you.

8          All right, go ahead.

9          MR. SINGER:  Is the --

10          THE COURT:  Do you want the lights down?

11          MR. SINGER:  I just need the projector to project.

12 Oh, maybe -- I'm sorry.  I need to --

13          THE COURT:  Can you bring -- thank you.

14     (Whispered conversation)

15          THE COURT:  Technical difficulties.

16          THE CLERK:  She's doing the audio -- I mean

17 projection.

18          UNIDENTIFIED SPEAKER:  (Indiscernible) on the

19 screens.

20          MR. SINGER:  It's on all the screens except for

21 the --

22          THE COURT:  It's online here.

23     (Whispered conversation)

24          THE COURT:  I apologize here, ladies and gentlemen.

25     (Whispered conversation)

1          MR. SINGER:  External PC, plaintiff.

2          THE COURT:  There is water here, too, ladies and

3    gentlemen.  You can help yourselves, or typically the person

4    down at the end is water passer.

5          (Whispered conversation)

6          THE COURT:  Should we take a break, Suzannette?

7          THE CLERK:  Your Honor, I would suggest that.

8          THE COURT:  All right.  Let's do that.  Ladies and

9    gentlemen, the -- we'll get the IT people here to help us, and

10   Suzannette can -- our deputy here will show you back to the

11   jury room as you take a short break and get this squared away.

12   We'll go off record.

13         THE CLERK:  Okay, thank you.  All rise.  Court

14   stands in brief recess.

15         (Court recessed at 2:20:11 p.m., until 2:29:24 p.m.)

16         (Jury out)

17         THE CLERK:  All rise.  Her Honor the Court, this

18   United States District Court is again in session.

19         THE COURT:  Please be seated, everyone.  All right,

20   we are back on record.  Have the technical difficulties been

21   solved?

22         MR. SINGER:  Yes.  And we just have a

23   miscommunication, Your Honor.

24         THE COURT:  All right.  Well --

25         MR. SINGER:  So to the degree it was my fault, I --

1                    THE COURT:  That's okay.

2                    MR. SINGER:  We just miscommunicated.

3                    THE COURT:  Well, now it's on the record.  So noted.

4    Okay.  Are we ready to bring in the jury?  Yes.

5                    MR. PARKER:  Doesn't that come out of your hour?

6                    MR. SINGER:  Right.

7         (Laughter)

8         (Jury in at 2:30:07 p.m.)

9                    THE COURT:  Hello.  All right.  Please be seated.

10   Counsel is ready.  All right.  We are ready.  We've solved all

11   our technical issues for the moment.

12                   All right.  Ready to proceed?

13                   MR. SINGER:  Yes, Your Honor, thank you.

14                   THE COURT:  All right.  And we can turn down the

15   lights, and we're good to go.

16                   MR. SINGER:  Before our intermission, I was

17   explaining to you that Mr. Lantz, with two other gentlemen,

18   had created this company American Leasing, that American

19   Leasing's sole business model was to do business that Lantz

20   was able to arrange through the Shaw government contract.

21   And then I was about to present to you some of the exhibits in

22   this case that showed how Mr. Lantz was trying to conceal his

23   ownership of American Leasing.

24                   This is exhibit 32.  It's a little difficult to --

25   may be difficult for you to see, so I'll read it for you.  But

in this email which he's sending to a man who's coming to appraise American Leasing's equipment, he says, "Please be discreet with the American Leasing name. I also work for Shaw as the project manager. Thanks so much."

And then in exhibit 31, which is also previously marked as an exhibit, he wrote, "Mike, it's important to know that you should not use my name when talking to anyone at Shaw or the government. Mr. Alvin Whitney is the name to use as the owner and operator of the company. I will explain on Tuesday." So he's actively trying to hide his ownership of American Leasing and doesn't want anyone talking about it when they're visiting with Shaw.

Now, in 2008 Mr. Lantz learned that the government would not lease equipment on the new contract -- the contract was going to turn over and there would be a new contract in 2009. And so what this meant is that American Leasing had all of this equipment that they'd purchased that they were leasing through their -- Lantz's deal that he'd set up with Shaw, and when the contract changed, that business was going to go away, he wouldn't be able to do that anymore. He either had to sell all of his American Leasing equipment or he had to get somebody to buy the company from him. As he said -- essentially he said only the government would be stupid enough to pay the high lease rates and that he wouldn't be able to find a private company to lease this equipment. I'll show you

1  a video clip from his deposition where he described the

2  predicament he found himself in in 2008 as he was approaching

3  September of 2008.

4  [2:33:13 p.m.]

5      (Portion of Richard Lantz videotaped deposition played)

6  [2:35:41 p.m.]

7          MR. SINGER:  So as of the end of September 2008,

8  Mr. Lantz had to liquidate that company and that equipment,

9  he had hundreds of thousands of dollars on the line, and he

10  was trying to keep the fact that he owned American Leasing

11  secret from Shaw, secret from the government.  That evidence

12  will show he had a motive to conceal his arrangement and he

13  had a motive to retaliate when he learned that Paul Blakeslee

14  was investigating American Leasing.

15          Let me tell you now about what Paul learned and a

16  letter that he prepared.  In August of 2008, Paul was working

17  as the assistant site manager at Ft. Richardson here in

18  Anchorage.  He was at the purchasing agent's desk one day in

19  August, and one of the guys on the crew said we're having

20  trouble with a vacuum truck, and Paul said, well, take it

21  downtown and fix it.  And they'd previously taken this truck

22  to some -- to a place called Yukon Repair, and so he said go

23  get it fixed.  The purchasing agent, a man named Ron

24  Babbs (ph), said we can't do that anymore.  And Mr. Babbs

25  explained Richard Lantz owns American Leasing, and he said

1  we've got to do -- we've got to fix it here.

2        Now, Paul was trained in conflicts of interest.  I'm

3  going to tell you more about Paul in a few minutes.  He had

4  been trained by Shaw in conflicts of interest, and he'd worked

5  on government contracts for most of his career.  He knew about

6  the rules that are supposed to protect taxpayers, that are

7  supposed to prevent fraud and abuse.  And this deal that

8  Mr. Lantz had with American Leasing, it didn't smell right to

9  Paul, it didn't sound legal to Paul.  So what did he do?  He

10  started to ask questions, he started to investigate.

11        He talked to several people who were involved in

12  purchasing and billing.  One man named Ralph Hummel (ph) told

13  Paul there was a lot of equipment involved here, and Paul felt

14  he had an obligation to report.  And so he started to work on

15  a letter in August of 2008.

16        Paul has a friend, Lucy Marler (ph), and she's a

17  retired executive secretary, and she helped him to write this

18  letter.  This was a serious thing for Paul; he didn't take it

19  lightly.  It was a slow, careful process.  He would write up

20  part of it in handwriting, and she would type it and give him

21  suggestions about how to phrase the letter, get it back to

22  Paul, and together they worked on this letter.  Ultimately, it

23  took them about six weeks or somewhere in a four-to-six-weeks

24  period to put it together.

25        In September of 2008, Paul told his coworker,

1 Bea Campbell, that he was looking into American Leasing, and

2 he told Bea that he was preparing a letter to Shaw's CEO.

3 Paul remembers telling Bea about the letter, and she's going

4 to testify in this case, and what she remembers is actually

5 seeing a copy of the letter.  And she'll testify that when she

6 learned what Paul was doing, she had a phone conversation with

7 Richard Lantz up in Fairbanks, and she told Mr. Lantz, you

8 better clean up this arrangement with American Leasing, and

9 she told Lantz that Paul was writing a letter.

10       Right after Paul had his conversation with Bea

11 Campbell and after she called Mr. Lantz in Fairbanks, what did

12 Mr. Lantz do?  He got on a plane, came to Anchorage, came to

13 Ft. Richardson, and called the site manager, Tom Stockmaul,

14 and Paul Blakeslee into an office, and Lantz said I hear

15 you're sowing hate and discontent in the workforce.  And he

16 wanted to know about Paul's age and demanded to know Paul's

17 retirement plans, and he asked Paul are you planning to go out

18 in a blaze of glory.  Paul said he wasn't planning to retire,

19 and Lantz then said, well, there's problems with your

20 attendance, Paul, and that Lantz was thinking about

21 eliminating Paul's job.  Lantz was angry when he said these

22 things, that will be the testimony.

23       This was upsetting to Paul.  He had very good

24 attendance; he was good at his job.

25       After that meeting with Lantz, Paul continued to

1    work on his letter to Shaw.  His friend Lucy Marler, who was

2    helping him with the letter, she did a search on computer -- a

3    computer Internet search of Alaska business records, and she

4    found state records that proved Richard Lantz was the owner of

5    American Leasing.  She even found his signature on a state

6    record, and they printed those documents out and attached them

7    out and attached them to the letter.  And she'll explain she

8    thought it was important that they have hard proof before this

9    went in because she didn't think it should be just one man's

10   word against another, that there should be some hard proof.

11         The -- Mr. Blakeslee's letter will be an exhibit in

12   this case.  It's an important piece of evidence.  Again, this

13   has already been admitted into evidence.  I'm going to show

14   you the letter now, it's three pages long, and I'll read you

15   parts of it.  Again, you'll get a chance to see it for

16   yourself later in the case.  This is exhibit 9A.

17         Now, Paul mailed it on September 19th, 2008, and

18   you'll see on the -- in the right -- it was received by Shaw's

19   CEO on September 23rd, 2008.  And in this letter he reported a

20   number of concerns.  If I can show you the second paragraph.

21   He reported that an employee in Fairbanks was stealing

22   government property.  He explained this employee, a man named

23   Steve Helstrom, had stolen about $250,000 in building

24   materials and equipment and he was currently under

25   investigation with the FBI.  And Paul explained that this man,

1  Steve Helstrom, was the business partner of the Shaw group

2  contract project manager.  That's Richard Lantz, that's the

3  project manager.

4          And then Paul next reported about how Richard Lantz

5  owned American Leasing.  This is the fourth paragraph of the

6  letter, and he says the next area of business to investigate

7  is the project manager, Richard Lantz, he is a business

8  partner with two other individuals, Steven Helstrom and

9  Alvin Whitney, who lease equipment to Shaw, such as a sewer

10  vacuum truck for $9,000 a month.  $9,000 a month, that's over

11  $100,000 a year for one truck.  The business name is American

12  Leasing, Paul wrote, LLC, in Fairbanks.

13          Paul explained that normally when equipment was

14  leased, the leasing company was responsible for necessary

15  maintenance but not on this arrangement, and he ended by

16  saying there's probably other equipment of this nature

17  involved that he had no knowledge of at the time.  When Paul

18  testifies to you, he'll explain why he reported about American

19  Leasing.  He knew this was improper or he suspected it was

20  improper for Mr. Lantz to be project manager on the one hand

21  and the owner of a company on the other.

22          Now, on the second page of this letter, Paul wrote

23  about a number of other concerns that were occurring.  Let me

24  show you the second paragraph.  Here he wrote about an

25  employee, Jennifer Burtowitz (ph), who was doing some

telecommuting from home and needed a better computer, and he told her that -- he told the CEO how Lantz had encouraged Jennifer to submit four hours of overtime each day without actually working the hours until she earned enough money to purchase the computer.  This amounts to a manager with payroll and fiscal responsibilities condoning the practice of falsifying time records.  Three employees witnessed this incident where he identifies Mr. Lantz instructing an employee to falsify her time records so she can essentially be overpaid and then use that money to buy herself a computer.

And then on the third page of exhibit 9, Paul raised his concern about the meeting that I just told you about where Mr. Lantz had come down and demanded to know when Paul was going to retire because of his age.  And so in this paragraph, the top of the page, he says, in addition to the above, on September 8th at 8:30, I was called to a meeting by Tom Stockmaul and Richard Lantz's office--the Anchorage-Ft. Richardson's office--and Mr. Lantz asked me what are your intentions concerning your job; I informed him I intended to keep my job and continue working, and Richard Lantz made the statement that because of my age he thought I might want to go out in a blaze of glory.

So Paul identified in his letter this American Leasing relationship; he identified that a business partner, Steve Helstrom, was being investigated by the FBI for

1  stealing; he told the -- about this incident with the -- with

2  the laptop and falsifying time records; and then he raised

3  this concern that he was being subjected to age

4  discrimination.  And at the end of the letter, Paul asked

5  Shaw's CEO to investigate all of these things.

6       Now, Shaw has a company code of conduct, and the

7  evidence will show -- I'm going to show you exhibit 7, and I'm

8  just going to show you page 4 from the code of conduct.  This

9  is provided to all of the employees who work on the government

10 contracts, and it's required of Shaw.  As a condition of

11 participating in this government contract, Shaw has to have

12 something like this.

13      So this is the section that tells the employees what

14 their obligations are.  You'll see in number 4 an employee is

15 supposed to report violations or suspected violations of which

16 you are aware, and he's supposed to report--there's three

17 options--to your supervisor, an officer of the company, or the

18 speak-up line.  Well, the chief executive officer of the

19 company is who Paul wrote his letter to.  That's an officer of

20 the company.  He was doing what he was supposed to do under

21 the code.

22      Now, let me show you what Shaw's supposed to do

23 under the code, what they promised.  Shaw says the manager's

24 obligation under the code -- and let me show you number 3, it

25 says treat reports of issues to you by employees seriously and

1  contact the chief compliance officer for assistance in

2  handling the report, and then in capital letters it says never

3  retaliate against employees who report issues.  Up at the top

4  of every single page of this code, it's a big, thick document,

5  every single page it says we don't tolerate those who

6  retaliate.

7          Well, let me tell you what happened when Shaw

8  received Paul's letter.  You're going to hear that a woman

9  named Kerry David was the chief compliance officer for Shaw.

10  She's a lawyer.  She works down in Baton Rouge, Louisiana.

11  She's the person who (indiscernible) the code is supposed to

12  work to make sure employee reports are treated seriously.

13  That's her job.  She receives whistleblower letters; the

14  speak-up hotline, she's the person who receives those reports

15  as well.

16          When the CEO received this letter on September 23rd,

17  it was routed to Kerry David, the chief compliance officer.

18  And when she got Paul's letter, she right away zeroed in on

19  that American Leasing arrangement that Richard Lantz had.  She

20  knew that was a problem.  And I'll show you what she says in

21  her deposition about her focus on American Leasing.

22  [2:47:49 p.m.]

23      (Portion of video deposition of Kerry David played)

24  [2:48:53 p.m.]

25          MR. SINGER:  Richard Lantz's boss was a man named

1 Jerry Barkhurst (ph).  He's a company vice-president. I'll

2 show you what he had to say in a video deposition about this

3 arrangement with American Leasing.

4 [2:49:05 p.m.]

5     (Portion of Jerry Barkhurst (ph) video deposition played)

6 [2:49:42 p.m.]

7         MR. SINGER:  And Mr. Barkhurst isn't the only

8 high-level person at Shaw who knew that this arrangement was

9 illegal.  You'll also see an email from a company

10 vice-president, Janet Oliver.  This is exhibit 67.  And in

11 that document she said we also need a solution on what we plan

12 to do about this since we can't continue to do business with a

13 crook but don't want to pass higher prices on to the client.

14 The crook she's referring to is Richard Lantz, the man you'll

15 learn in a few minutes initiated Paul Blakeslee's termination.

16         Now, going back to what happened when Shaw received

17 this letter, Kerry David, the chief compliance officer, she

18 started to look into it on Monday, September 29th.  Her focus

19 was exclusively on American Leasing.  She called and

20 interviewed Paul Blakeslee on that day, and she took notes

21 from that phone call which you'll see later as an exhibit in

22 the case.  Paul told her he did not think American Leasing was

23 getting three bids.  You'll learn that they're supposed to get

24 three competitive bids on these contracts.  That's a

25 protection that's in place to make sure the government is

1  getting a fair deal.  He told her he didn't think that was

2  happening.  He'll explain to you the reason is he knows that's

3  wrong, that's illegal.

4         He also told Kerry David that he thought Lantz was

5  freezing him out.  He told her that, again, that Lantz had

6  brought up his age, that Lantz had suggested Paul should quit,

7  and Paul told Ms. David that he was 71 years old.

8         The day after she talked to Paul on the telephone,

9  September 30th, Ms. David asked her Internet department -- or

10  her IT department for all of Lantz's emails for the prior six

11  months.  I'll show you, this is exhibit 47.  So she's -- they

12  have an internal email system for all the employees, and Kerry

13  David, as the chief compliance officer, has access to them.

14  So she says please pull emails of Richard Lantz for the last

15  six months.  This is at 7:27 in the morning on September 30th.

16         And just about five, six hours later, in exhibit 48,

17  she's done enough investigating at this point to send an email

18  to the chief financial officer for the whole company to report

19  what she's learned.  And this is a little hard to see here.

20         It says:  I'm reviewing a new matter in the Shaw E&I

21  (ph) area.  Evidently, a project manager on a government

22  project is approving invoices for leasing of equipment to a

23  company of which he owns a third.  A former employee also

24  appears to own a third.  This employee was terminated in

25  March/April because he stole government property off the job

1  site and he's currently being prosecuted by the government.

2           She goes on to identify how much money she thinks

3  they've paid his company and that she's looking into details

4  about whether this was bid correctly.  And she says this

5  employee failed to disclose this business relationship on his

6  mandatory employee survey for the last two years, and she

7  wanted to let these high-level -- the chief financial officer

8  and also the general counsel for the company, that's who she's

9  reporting to.  So she's done this investigation as of

10 September 30th to conclude these things.

11          Now, the evidence will show that both in Paul's

12 letter that we saw--it was marked as exhibit 9, the September

13 19th letter--and in the phone call he had with Kerry David, he

14 flagged these concerns that he was being -- they were freezing

15 him out, that they'd raised his age, that they were

16 threatening to eliminate his job.  Ms. David never looked into

17 any of those concerns.  She only focused on American Leasing.

18 And she'll explain to you that the reason is because American

19 Leasing, that was a problem that threatened their government

20 contract or raised an issue with their government contract,

21 the contract for which they receive more than $100,000,000 a

22 year -- or in five years from the government.  So she focused

23 on the company's revenue and she didn't focus on whether

24 Mr. Blakeslee was being subject to discrimination or

25 retaliation.

1          Now, let me tell you how Paul was fired.  Remember,

2    again, Shaw received Paul's letter on September 23rd, 2008,

3    and it's stamped right there on the top of the letter.  And

4    the very next day, September 24th, Richard Lantz sent an email

5    to a woman named Michele Cooke, in Human Resources, and he

6    asked for permission to eliminate Paul Blakeslee's job.  He

7    claimed they were reorganizing for a contract that would come

8    up in five months, and so he no longer had a position for

9    Paul.

10          Now, Michele Cooke, who received this email, she had

11   a law degree, and she'd worked for Human Resources -- in human

12   resources for different companies for almost 20 years.  She

13   was immediately suspicious when she received Mr. Lantz's

14   request to do a reduction in force.  You might hear reduction

15   in force or RIF.  RIF is what they call this job action in

16   Shaw.  Here's a clip of what Ms. Cooke said in her deposition

17   when she -- about what she thought when she received Richard

18   Lantz's request:

19   [2:55:53 p.m.]

20      (Portion of Michele Cooke video deposition played)

21   [2:56:45 p.m.]

22          MR. SINGER:  Kerry David told Cooke she was already

23   handling things, but in fact she didn't look into it at all.

24   And what happened is that Human Resources Department

25   ultimately decided that a reduction in force is a line

1  decision.  That means it's a decision made by the project

2  manager.  So Lantz was given permission to proceed with his

3  termination, and on October 6th Mr. Lantz came down to

4  Anchorage from Fairbanks, called Paul into an office, told him

5  you're job's eliminated, put your things in a box and get off

6  the premises immediately.

7          Now, right after this, you know, Paul immediately

8  felt this must be retaliation, this is discrimination, it

9  wasn't right, it didn't make sense.  And he had a discussion

10 with the woman you just saw, Michele Cooke, and she wrote an

11 email to the chief compliance officer, Terry David, recapping

12 her discussion with Paul.  Let me show you, this is a long

13 email, it's two pages of email, but it's an important exhibit

14 in the case, exhibit 73.

15         Michele Cooke reports to the chief compliance

16 officer:  Just spoke with Paul, he had quite a report to make,

17 he started the conversation by telling me that he thought the

18 action Monday was initiated due to his complaint to

19 Mr. Bernhardt (ph).  I said I wasn't aware of any complaint,

20 and so he read the letter to me.  I said I'd not heard or seen

21 any letter.  As he read the letter and filled in details, he

22 said he felt this was all part of the reason they got rid of

23 him.

24         Next, she communicates to Kerry David something that

25 Kerry David already knew, which is that this discussion had

taken place between Lantz and Paul about Paul's age and
whether Paul wanted to retire and go out in a blaze of glory.
And let me show you what -- how Kerry David responded to this.
First she was upset that there was any mention that Paul had
made a speak-up call.  Kerry David wanted that to be secret,
that Paul had made a report.  And she says in this -- she says
Paul Blakeslee's letter to Bernhardt (ph) was referred to me
at the time he had the conversation with Lantz but had not
been told he would be terminated, which isn't -- the -- even
Paul's letter says -- said he'd had the September 8th meeting,
that Lantz had called him in, asked him about his age, and
threatened to eliminate his job.

But Ms. David said Lantz had not said he would be
terminated.  Ms. David then says I've not talked to Lantz at
all about this issue, so I know the layoff was not -- and she
does all capital letters -- not in retaliation for his sending
the letter to Bernhardt.

So Ms. David, sitting in Baton Rouge, makes this
judgment:  This can't be retaliation because I, Kerry David,
have not told Richard Lantz that I received Paul's letter.
Then even she acknowledges in her parentheses, right after
that, she says, unless he otherwise communicated it to Lantz.
So she acknowledges, well, maybe Lantz learned about the
latter from some other source.  But she doesn't do anything to
investigate whether that may have happened.  And then she says

whether or not Lantz is telling the truth is probably an issue

for another say.  She's -- and then she makes the decision:

We've done our review into that issue, that being Paul's

termination, and Blakeslee can file a claim on it if he so

desires.  So she makes this rather cold, calculated judgment:

We're not going to look into whether Paul's being retaliated

against; Mr. Lantz might not be telling the truth, but Paul

Blakeslee will have to file a claim if he feels this is

wrongful.

And then she tells Human Resources, I will be

handling investigation and consequences of the other issues

raised in Blakeslee's letter ask that you not -- and she does

all capital letters again -- not communicate anything in there

to Lantz.  So she's going to take care of it.

Now, right after that, Michele Cooke -- just a few

minutes later Michele Cooke responds, and she says, Paul told

me several people knew about the letter and he assumed I was

calling him to follow up on it.  So Michele Cooke immediately

contradicts the chief compliance officer, immediately tells

her, well, you might -- you may not have called up Richard

Lantz and told Richard Lantz about Paul's whistleblower

letter, but several people knew about the letter.  So the

person who is responsible for protecting whistleblowers at

Shaw is the chief compliance officer.  Remember, the managers

are supposed to take reports seriously and they're supposed to

1  get the help of the chief compliance officer to do that?  And

2  here's the chief compliance officer being fed information from

3  Human Resources to suggest that several people knew about

4  Paul's letter and Paul believes this is retaliation, and the

5  chief compliance officer's response is, can't be, I'm not

6  looking into it.

7         MR. PARKER:  Your Honor, this is getting

8  argumentative.

9         THE COURT:  Let's move on.

10         MR. SINGER:  The same email exchange also raised

11  that there was a conflict with regard to age, that Richard

12  Lantz, on the one hand, told Human Resources I never talked

13  about age with Paul Blakeslee, and that Paul Blakeslee, when

14  he was reporting, said Mr. Lantz brought up my age and asked

15  me when I was going to retire.  That conflict between what

16  Lantz said happened and what Paul said happened, that was

17  presented to these decision-makers, but there was no

18  investigation on that issue either.

19         You'll learn that Michele Cooke, the Human Resources

20  person, asked for permission to fly to Alaska and investigate,

21  but that request was denied.

22         Now, just a few weeks later, so Paul has now been

23  fired, this is early October, Paul's been fired by Richard

24  Lantz, a few weeks later at the end of October, Shaw fired

25  Richard Lantz.  They fired him because of American Leasing;

1  they fired him for the very thing Paul had reported.  They

2  terminated all the business dealings with American Leasing.

3  They reported the whole situation to the Army.  All that

4  happened because of Paul's whistleblowing.  Because of Paul,

5  Richard Lantz no longer got to line his pockets with taxpayer

6  money.  Paul put a stop to that scheme.

7          But even after Shaw concluded its investigation on

8  American Leasing, nobody ever thanked Paul, and certainly

9  nobody looked into whether he'd been the subject of

10 retaliation or discrimination.  Instead, what the evidence

11 will show is that after firing Paul, Shaw's made up several

12 and conflicting explanations for why it fired him.

13         Paul was very well liked by the crew out at

14 Ft. Richardson, and they were upset when he was fired.  In

15 November a company vice-president, the man who was right above

16 Richard Lantz, a man named Gary Barkhurst (ph), who I showed

17 you earlier, he was in town in November 2008, and he told

18 several people who were asking why was Paul let go, he told

19 them Paul was fired because he had poor attendance.

20 Mr. Barkhurst now denies saying that, and now he says Shaw

21 eliminated the assistant site manager job.  We'll call witness

22 who met with Mr. Barkhurst in November 2008, and you'll get to

23 hear what they recall, and it's up to you to decide whose

24 testimony is credible.

25         Now what Shaw claims is that they let Paul go

because they eliminated the assistant site manager position.
The evidence will show that isn't true, either.  In fact, they
just gave the job to somebody else, a man named David Shew.
We'll call several Shaw employees who will tell you that after
Paul left, Mr. Shew moved into Paul's job, he moved into
Paul's office, that he was the man who, if the project site
manager Tom Stockmaul was away, Dave Shew was in charge.
Before Paul was fired, he had that responsibility.  We'll show
personnel records that indicated they created a new position
for Mr. Shew, and it says right in there this job includes the
assistant site manager duties.

In fact, you'll learn Shaw couldn't eliminate the
assistant site manager job.  They can call it some different
title, maybe, but the responsibilities of the job are
critical.  Shaw had an obligation on its contract with the
Army to have key personnel available 24/7, and these are
military facilities, that Shaw's job is to support the
military mission.  You've got to be available 24 hours a day,
seven days a week, to support that mission.  And so when the
site manager isn't around, there has to be somebody to serve
in that role.  That person is the assistant site manager.  So
Paul Blakeslee had that job until he was fired.  After he was
fired, it was David Shew.

I touched earlier on age discrimination.  Let me
talk about that for a minute before I conclude.  In addition

to his whistleblower claim, Paul asks the jury to consider whether age was a factor in a decision by Richard Lantz and Tom Stockmaul to terminate Paul.

Shaw witnesses say they had a discussion sometime in August about reducing the job force to be more competitive when they rebid the contract later in the year. Some of them say they were doing to reduce costs by 10 to 15 percent. But the evidence will be the only person who lost his job was the oldest employee on the workforce. The evidence will be they didn't do a single other thing to reduce costs other than firing Paul Blakeslee.

And you'll hear that starting in the fall of 2008, Mr. Lantz started making repeated inquiries about Paul's job performance and specifically about his attendance. Mr. Lantz didn't ask those questions about any other employees. The evidence will suggest Lantz was looking for a reason to get rid of Paul.

You're also going to hear that the site manager, Tom Stockmaul, made explicit comments about Paul's age. He said things like the old man's got to go. And Stockmaul told Bea Campbell people get set in their ways, and when they get to a certain age, then they should know it's just time to retire.

Shaw says this was supposed to -- getting rid of Paul's job was to make it more competitive for the new

contract.   The evidence will show the new contract went up by
$20,000,000, not down, and the new contract required more
manpower, not less.   You'll have to ultimately decide whether
age was a factor in the decision to terminate Paul, if these
gentlemen were looking for a reason to get rid of their oldest
employee, and then when they -- when Lantz learned that Paul
had reported or was investigating American Leasing, Lantz went
ahead and pulled the trigger.

I've talked a lot about Shaw and what Shaw did and
did not do.   Let me finish by telling you a little bit about
Paul Blakeslee.

Paul is a man who has worked his whole life.   Work
is really a defining part of who Paul is as a person.   He left
high school early and started working as a teenager because
his family had hit hard times.   He joined the Navy and then
the Air Force, served our military, and then he went into the
civil service.   He came here to Alaska.   He was stationed for
a time up in (indiscernible), north of Nome, and he ultimately
ended up at Adak Island at the naval air station there, and
for 33 years, Paul lived out on Adak and ran the power station
there as well as the water and sewer system.   He had a whole
crew of people who worked for him.   He ran large budgets.   He
was literally responsible for keeping the lights on at that
naval air station.   And then when the Navy decided to pull out
and close the base at Adak, a government contractor hired Paul

1  to go out and help run that shutdown process.

2          Paul originally retired from Adak in the year 2000,

3  and he was here in Anchorage.  In 2003 a friend told him about

4  a job opening at Shaw, and he applied.  Paul was bored in

5  retirement.  He wanted to go back to work.  And you'll hear

6  that when Paul went back to work at Shaw, he had excellent job

7  performance.  He enjoyed the work, he was well-respected by

8  the men and women who reported to him, and he had a good

9  relationship with the Army.

10          Now, there's a stereotype that people should retire

11  when they hit 65, they should go enjoy their golden years.

12  Paul didn't want to go enjoy his golden years.  He wanted to

13  work.  And the evidence will be that if Paul had not been

14  fired by Richard Lantz, he'd be out at that base today working

15  instead of sitting here in the courtroom.

16          After Paul was fired, he tried to get another job.

17  He worked with a job placement expert, a woman named

18  Gwen Kennedy, and she'll testify about Paul's efforts.  It's

19  not easy for a man of Paul's age to find new work.  There's a

20  stereotype, again, that older people should go retire, and so

21  employers don't want to invest in a new employee who they

22  perceive may retire soon.  The evidence, again, will be that

23  Paul doesn't fit that stereotype.  He was a real asset to

24  Shaw, and he'd be working out there solving problems on that

25  contract if he had the opportunity.

1      At the end of the day, it's going to be your job to

2  decide if the evidence supports Paul Blakeslee's claims for

3  wrongful termination.  If this was a wrongful termination,

4  then we'll ask that you make it right.  Thank you.

5          THE COURT:  Thank you, Mr. Singer.

6          Ladies and gentlemen, let's do the following. We'll

7  take a break until about 3:25.  Will that give you another

8  time, Mr. Parker?

9          MR. PARKER:  Yes.

10         THE COURT:  And then we'll hear from the defendant's

11  closing [sic] argument.

12         Please remember my admonition not to discuss the

13  case during this break, and we'll be on record again at 3:25

14  for the defendant's opening.  We'll go off record.

15  [3:11:51 p.m.]

16      (End of requested portion)

17
                        **CERTIFICATE**
18
I certify that the foregoing is a correct transcript from the
19  electronic sound recording of the proceedings in the above-
entitled matter.
20

21
     S/M. Gaylene Larrecou                March 6, 2013
22  M. Gaylene Larrecou, Transcriber        Date
United States Court Approved
23  AAERT Certified #00285

24

25

*Gaylene's Word Services*
*907-338-3936*